## THE LA JUNTA AND LAMAR CANAL COMPANY v. HESS.

|  |  |
|---|---|
| 6 | 497 |
| s25c | 517 |
| 6 | 497 |
| e17 | 30 |
| e17 | 40 |
| e31s | 12 |
| 31s | 234 |
| 31s | 239 |

WATER CONTRACT CONSTRUED.

Appellant, a ditch company, sold to appellee a water right, and stipulated in the deed that when it shall have sold and shall have outstanding and in force water rights equal to the estimated capacity of its ditch to furnish water, and when two thirds of all such rights shall have been paid for, the title to its canal shall pass to the owners and holders of contracts for such water rights on a plan stated, which provided for the organization of a new corporation, the stock of which should be issued to water right holders under the

old company, and the new company and its stockholders to be the owners and in control of the canal and the water of the same. *Held*, that the company having sold and outstanding water rights equal to its capacity to furnish water, for two thirds of which it had been paid, the appellee was entitled to relief compelling the company to perform that part of its agreement relating to the organization of a new corporation and the change of ownership and control of the canal.

### *Appeal from the District Court of Prowers County.*

John Hess filed a bill on behalf of himself and other purchasers of water from The La Junta and Lamar Canal Company and its predecessor, The Arkansas River, Land, Reservoir and Canal Company, to compel the performance of a certain condition specified in his deed and in all others which were issued by the Canal Company, providing generally for the transfer to the purchasers by the company of the title to and control of the canal on the happening of certain events. Whether the agreement literally provided for the transfer of title is unimportant, but the agreement in this respect is set out in that portion of the deed which is contained in the statement. He averred the occurrence of the events on which the right to control arose, and otherwise stated his right of action. The deed, in so far as it is under consideration in this opinion, is as follows:

" Know all men by these presents, that The Arkansas River, Land, Reservoir and Canal Company (a corporation existing under the laws of the state of Colorado) of the first part, and John Hess of the county of Bent and state of Colorado, of the second part, for and in consideration of the sum of fifteen hundred dollars paid by said second party, the receipt whereof is hereby acknowledged by said first party, and in consideration of the mutual covenants and agreements in this deed contained, to be performed and kept by both of said parties, and hereafter specifically mentioned, the said first party hereby grants, bargains, sells and conveys to the said second party, his heirs and assigns, one and one half water right; that is to say the right to use of water flowing through

the canal of said first party, each water right representing one and forty-four one hundredths (1.44) cubic feet of water flowing under a weir per second, subject, however, to the following reservations and conditions, to which said party of the second part expressly agrees:

" First. Said company to furnish the said water to the second party or assigns continuously during the irrigating season, except as hereinafter provided, and at no other time, unless with consent of company thereto in writing.

"Second. Said water shall be used for irrigating and domestic purposes on the following described tract of land, to-wit: One hundred and twenty acres in the southwest quarter of section 18, township 22, south of range 46, within Bent county, Colorado.

" Third. Said company expressly reserves to itself the right to distribute the water from its said canal in accordance with such rights and priorities as are or may hereafter be established or decreed; and this deed is received by the party of the second part subject to such priorities.

" Fourth. The said second party, his heirs or assigns, shall not permit said water or any portion thereof to be furnished as aforesaid, to run to waste, but as soon as a sufficient quantity shall have been used for the purposes herein allowed, the said second party, his heirs or assigns, shall in such a manner as the first party may prescribe notify the first party that the said water may be shut off, and shall also give the first party timely notice when the same shall be again needed for the purposes aforesaid; but in no case shall the amount of said water taken or received at any time by said second party, his heirs or assigns, exceed the quantity first herein referred to.

" Fifth. The said company shall deliver said water at such point or points along the line of said canal or ditch, or from any of its reservoirs, or either or all, as it may determine to be the most practicable, and the manner of withdrawing and regulating the supply of said water from said company's canal, ditch or reservoir shall be prescribed by said company, and shall at all times be under its control, as determined and

directed by the board of directors of said company. The headgates, flumes, weirs or other arrangements through which the water hereby sold shall be drawn off from the said company's canal, ditch or reservoirs, shall be made and placed in position by said company, but at the cost of the said second party, who shall be liable also for the expense of keeping the same in good repair and condition, and the said company may collect and enforce the payment of all sums expended for said purposes in the same manner as prescribed for collecting and enforcing assessments.

" Tenth. It is further agreed that the irrigating season shall commence April 1st, and continue to November 1st, of each and every year, and that thereafter water shall be conveyed for domestic purposes whenever reasonably practicable ; subject to the right of said first party to repair, enlarge or extend said canal.

" It is hereby further stipulated and agreed that when said first party shall have sold, and shall have outstanding and in force a number of water rights equal to the estimated capacity of the company's ditch, to furnish water, and two fifths of the contract price for the same shall have been paid, then the holder or holders of such contracts for water rights shall have a voice and vote in the management of the affairs of said company's canal, proportional to the interest which said second party's contract bears to the entire number of contracts outstanding; and when two thirds of all such outstanding rights have been fully paid for according to the terms of the several contracts entered into, then the title to said canal shall pass to the owners and holders of contract for such water rights at the time, on the plan following :

" Within sixty days thereafter, at such time as may be fixed by the board of directors of first party, said board of directors of said first party shall hold a meeting for the purpose, and thereat designate five persons who are at that time owners of water rights under said ditch, to be the incorporators of a new company to be incorporated under the laws of the state of Colorado, and which said five persons shall

within thirty days thereafter subscribe to articles incorporating a stock company under a new name, and said five persons shall be the directors for the first year; and immediately following the signing and filing of articles of incorporation, the directors thereof shall organize, make by-laws, procure a seal and otherwise proceed as the law directs; and at said time they shall issue of the capital stock of the new company, full paid, to the owners of said water rights, such a proportion of the whole of said stock, as the water right each owner thereof has, will bear to the whole amount of water rights sold as aforesaid, and second party hereby agrees to accept and receive the stock of said new company as aforesaid, and when said water rights shall have been fully paid as aforesaid, and when said five persons shall have been named as herein provided by first party, and said five persons notified in writing of that fact, and that said water rights have been fully paid, as aforesaid, then the obligations of this company, said first party, in respect to said ditch and the keeping the same in repair, or supplying water through the same, or any other ditch, canal or reservoir connected therewith, shall cease, and the said new company and the stockholders thereof, shall thereafter be the owners and in control of the said ditch and the water of the same.

" Now, therefore, said second party does hereby agree with said first party that this deed, and the right of said second party to vote and have a voice in the management of the company, is subject to the limitation that said second party shall not, by reason of anything in this deed contained, or by reason of any relation he may bear to this company arising out of said water right, be entitled to claim, demand or receive any part or portion of any moneys arising out of the sale of any stock of said company, should the said company find it necessary to increase its capital stock, and the said second party is to be allowed a voice, and vote only as relates to the said company's affairs at the time of executing this deed, and necessary to securing to said second party the fullest enjoyment of said second party's water right.

"It is further agreed that if said five persons provided to be appointed to incorporate a new company should decline or fail to incorporate said new company as herein contemplated, then the first party may within thirty days appoint others for said purpose, and so continue to appoint persons until said company is incorporated as herein provided. And it is further agreed that the said first party will deliver said ditch to the water right owners as aforesaid, and at the time and manner aforesaid, free of any debts against the same."

That part of the plaintiff's case which was dependent upon proof of the sale of water rights and the payments made for them was disposed of by a stipulation, which is in the following terms:

"It is hereby agreed between opposing counsel and the same may be taken as true without further evidence, that there has been issued to be satisfied from the property in controversy, by The La Junta and Lamar Canal Company and its predecessor in interest, The Arkansas River, Land, Reservoir and Canal Company, water rights representing at least ten hundred and ten (1010) cubic feet of water per second of time, substantially in the form as set forth in the deed of the plaintiff Hess, and that at least two thirds of said water rights have been paid for in full, and that water deeds have been issued thereupon to the holders, the said water deeds being substantially in the form of that held by plaintiff Hess."

There was no other testimony respecting the number of persons who had become purchasers by similar deeds, nor anything to show what or how much water had been used in irrigation by those who had acquired rights. There was evidence offered respecting the amount of water essential to irrigate eighty acres of land and the probable number of days during which that water should be applied. Respecting the estimated capacity of the ditch to furnish water the evidence was directed to three points: One, to show the extent of the diversion by the Canal Company; another, its cubical capacity to carry water; and third, its actual capacity to deliver to the consumers who had become purchasers by contract. There

was no testimony showing exactly how much the company
or its predecessor had diverted, nor whether it had acquired
a title to either such right as comes from the diversion alone,
or such as may come from the conjunction of diversion and
subsequent application.   The only evidence the plaintiff of-
fered to establish the diversion was the decree adjudicating
the priority of the ditch and its number.   According to this
decree it had a priority over subsequent appropriators for
$761\frac{8}{10}$ cubic feet of water.   Whether the normal supply in
the river was enough to satisfy all antecedent priorities and
give the company this amount of water does not appear.   We
are left entirely in the dark as to what water the company
had acquired a right to, what it could distribute during vari-
ous seasons, how much was in use, and generally what its
capacity to furnish water was or might be.   The only two
things which tend in this direction at all was the decree
awarding it a priority for the specified amount and the engi-
neers' measurements of its cubical capacity.   It was measured
by engineers at various points from one near its headgate to
one some twenty odd miles below.   The meagerness of this
proof is more fully illustrated by the statement of the length of
the ditch.   It was 113 miles from its headgate to the end.   The
measurements taken were some four in number, at different
points of the line as stated.   According to them, the capacity
of the canal at the headgate was 1,533 cubic feet.   At the
wastegate below it was 952, twenty miles below it was 671,
and at the other point it was 681 cubic feet per second.
Otherwise than as this cubical capacity may determine it,
we are unadvised as to the capacity of the ditch to furnish
water.   The plaintiff furnished evidence tending to show a
failure by the company to supply water to its customers for
several seasons and to prove the difficulty which the com-
pany experienced in either obtaining or delivering water.
The case is not clear as to whether this failure proceeded
from a failure of the supply of the water, the lack of capacity
on the part of the ditch to carry it, or some other physical
facts about the ditch which might interfere with the delivery

of its supply.   The ditch was new, and according to the testimony of the engineers its water supply would be very much diminished by seepage as well as by evaporation.

After this suit was commenced a receiver was appointed to take charge of the ditch.   This receiver gave evidence as to the difficulties which he experienced in delivering water. The canal runs through three counties,—Otero, Bent and Prowers.   The receiver found it impossible to deliver water at the farther end of the ditch by ordinary methods.   It was necessary to shut off all the headgates in Otero and Bent counties to deliver water in Prowers.   Some of the witnesses testified that part of the time no water had come within thirty miles of their place, and others that there had been an insufficient delivery for the purposes of successful irrigation.   Notwithstanding the concession of the number of water rights sold and paid for, and a refusal to transfer the title and management to the grantees, an intent to retain possession and control of the canal was admitted.   Some evidence was offered about two reservoirs along the line of the canal which were apparently expected to make a part of the system. What is called the Prince reservoir was scarcely a reservoir at all.   It was simply an enlargement or widening out of the canal into a pond at a point where the surface of the country was depressed and where it was possible in times of an excessive supply of water to store water for future delivery. Taking this reservoir at its utmost capacity, it could only furnish what would be the equivalent of ten water rights as they are measured and designated in these deeds.   The King reservoir was off the line of the canal and was supposed to be filled through a lateral which ran from the main line, by means of which accumulating and surplus water could be stored for future use.   This reservoir, however, had never been utilized.   While some water had been run into it, no outlet had been constructed, and for all practical purposes it did not exist as a part of the system.   All these facts respecting the capacity of the canal to furnish water and the sale of water rights were set forth in the bill.   The answer took

issue on some of these matters. Therein the actual and estimated capacity of the canal and its reservoirs was put at 1,261 cubic feet. Of course the company cannot now controvert this admission. It introduced evidence to establish how many water rights could be delivered from the two reservoirs if they had been full and available. The capacity of the Prince was 10 and of the King 137 cubic feet. There was no evidence as to the extent of the user of these water rights by the purchasers. While the deeds specified the water was to be used upon a designated tract of land, there was reserved to the grantee the right to use it on any other land which he might own, providing the relocation was made without detriment or expense to the company. On this proof the court entered a decree and found as a matter of fact that the capacity of the canal had been oversold and that the holders of the water deeds were entitled to the performance of the contract. It was adjudged that the company should deliver a proper deed of conveyance of its canal and reservoirs with its property rights and franchises " to such new corporation as the plaintiff and other holders of water rights in the said canal may organize, for the purpose of operating and managing the said property ; and in default of the defendant company so doing let the clerk of this court execute such conveyance." The court reserved all questions as to the persons who should be entitled to participate in the new company and as to the cancellation of water rights which might be found to be illegal ; continued the management of the canal in the hands of the receiver, maintained the injunction, and directed the receiver to report certain matters of fact which might be essential for the ultimate decree.

From this decree the company appealed and brought the case here.

Mr. EMERSON J. SHORT and Mr. JOHN R. SMITH, for appellant.

Mr. CHARLES E. GAST, for appellees.

BISSELL, J., delivered the opinion of the court.

Most of the difficulties which would have environed this case if its principal questions were *res nova* have been removed by a recent decision of the supreme court. *Wyatt et al. v. Larimer & Weld Ir. Co.*, 18 Colo. 298.

With some matters discussed in that decision wherein there was a difference of opinion between the majority of this court as then constituted, and it, we have nothing to do. It is here wholly unnecessary to examine the status of a ditch company or of a purchaser of water from it, respecting their relative or their particular estate, title, or property rights either in the ditch, the water or both, save as they are expressed in the alleged contract. The present controversy must be settled by the construction of that contract as affected if at all by the proof concerning the acts of the contracting persons and the happening of the events which are claimed to give rise to the cause of action laid in the bill. The two cases are presented in a radically different way. The first was an appeal from a judgment sustaining a demurrer to a complaint which set up a contract similar in some of its essential features to the one laid in the present bill. In this suit there was a deed executed by the company to Hess containing the conditions. The only concurring particulars in the two cases which must necessarily lead to similar results are to be found in the terms of the deed in the one case and of the contract in the other, and the force and effect to be given to the language which the parties used. In the former case the court resorted to the definition of a water right contained in the printed forms and contracts used by the Irrigation Company. Here in the language of the deed itself, we find the same aid to interpretation which was held controlling in the judgment of the supreme court in the former litigation. By recurring to the statement of facts it will be observed the company granted to Hess one and one half water right. What a water right was is defined by the following language in the deed : " that is to say the right to the use of water flowing

through the canal of said first party, each water right representing 1 $\frac{44}{100}$ cubic feet of water flowing under a weir per second." Having in view this definition of the term "water right," we must recur to a subsequent condition which is in reality the basis of the suit. By a portion of the eleventh condition, it was substantially stipulated that when the company should have sold and have outstanding a number of water rights equal to the estimated capacity of the company to furnish water, and two thirds of those rights should have been fully paid for according to the terms of the contract, then the title to the canal should pass to the holders of the deeds. In this latter particular there is a very wide difference between the *Wyatt Case* and the present. In the *Wyatt Case* the agreement provided that upon the happening of the contingency, to wit, the disposition of a certain amount of water rights, the company should issue to the other contracting party a certain number of shares of stock in the corporation which would be evidence of his right to the control and management of the property.

The condition contained in the present deed is much more persuasive and controlling. It is an absolute agreement between the company and the consumer that upon the happening of the event, to wit, the sale by the company of the full quantity of water which it should be able to furnish and the receipt of pay therefor, the holders of deeds who may have paid the money shall thereupon become the owners of the canal, subject of course to certain other conditions and features of regulation and control which are foreign to the present discussion. Accepting the construction of the supreme court of the words " estimated capacity to furnish," we must conclude that if the contingency has happened the purchasers of water by deed from the present appellant have acquired an absolute vested interest in the ditch, have become owners of the property and are entitled to have the scheme provided for carried out and the evidence of that title executed and delivered to them. The stipulation into which the parties have entered, coupled with the other proof contained in the

record, certainly establishes the concurrence of those things which invest the grantees with the right to these evidences of title. It is agreed the company has sold 1,010 cubic feet of water and have received their pay for more than two thirds of it. The only remaining inquiry is whether the 1,010 cubic feet is coincident with their capacity to furnish water. Its capacity to furnish water is not measured by the inches which would be the quotient of the cubical capacity of the ditch divided by the number of water rights which have been sold, but it is the quotient derived by dividing the total amount of water which the proof shows the company is able to furnish by the number of rights, according to the definition furnished by itself and its own deed which have been disposed of. The same result would be reached if the cubical capacity of the ditch was taken as the dividend in the present case. This suggestion is not made for the purpose of indicating any dissent from the conclusion reached by the supreme court, but to demonstrate that as the event has happened, the plaintiffs are entitled to some relief. There was a very distinct failure of proof on the part of the plaintiff respecting the exact amount of water which the company could furnish; in other words, its capacity to furnish water was not very satisfactorily settled. The plaintiff produced a decree establishing the priority of the company to 761 cubic feet over subsequent appropriators of water from the river. Its relation to all appropriators was not established, at least with reference to the water supply of the river. This was in no manner a measure of its capacity to furnish, because it did not definitely determine the supply. But in another respect, the plaintiff assumed and discharged the burden by the testimony which he produced respecting the inadequacy of the supply from year to year to furnish the various users under the ditch. The evidence in this regard was not very satisfactory, but the company did not undertake particularly to dispute it, and it may be fairly assumed to have been shown that sufficient water did not flow through the ditch to satisfy the needs of its consumers at the times when water was

wanted for irrigating purposes.   Witnesses were produced who testified respecting the size of the ditch.   The engineers were agreed on this subject.

The ditch was large enough at its head to carry more than the water which had been sold, but twenty miles from this gate, its dimensions were limited to 671 cubic feet.   Whether with a continuous flow this would have succeeded in discharging the 1,010 cubic feet which the company had sold and give to the purchasers the water to which they were entitled, cannot be exactly and definitely determined.   Possibly, if it was run bank full and continuously, the parties might have succeeded in getting what they had purchased.   We are unable to conclude what the fact may be about it, but the size of the ditch coupled with the proof respecting the failure to deliver water and the finding of the court that the company had oversold its capacity, is sufficient to entitle us to conclude that there was a number of water rights outstanding equal to the capacity of the company to furnish water, and when it is conceded that two thirds of them had been paid for, the right of the parties to relief is manifest.   Very much discussion has been indulged in by counsel respecting the reservoir rights of the company and the increase which the reservoirs add to the capacity of the canal to furnish water. There are two answers to the contention.   The agreement is that the grantees shall become the owners when the company shall have sold its ditch capacity, not when it shall have sold its ditch plus its reservoir capacity.   Again there is no proof of the availability of these reservoirs.   If it be assumed that the Prince reservoir is so far completed as to be useful in storing water and adding to the supply, this will only add ten water rights to those which may be furnished from the direct delivery of the canal itself.   The King reservoir may be dismissed from consideration.   It is not completed and is totally useless without an outlet, which has never been constructed.   If the company desired to preserve the control of their canal and dispose of water which could be supplied from this reservoir as a part of their general system and defer the

time when the title to the canal should vest in their grantees, it was incumbent upon them to complete it and make it a part of the system which they contend was their original scheme. At present it is no part of it. A very ingenious argument is sought to be constructed upon the computation of the length of time it takes to irrigate eighty acres of land, the number of days which land must be irrigated for successful agriculture, and the number of times the Prince reservoir could be filled and emptied during an entire season. The amount of water which could thus be stored and delivered is estimated at an enormous quantity, which it is insisted should be taken as a part of the estimated capacity of the canal to furnish water. We cannot assent to the theory. In the first place the company has sold and granted a definite water right of one and forty-four one hundredths cubic inches, and has stipulated that there shall be a continuous flow from April until November. It is impossible for them to escape the force of this contract and to relieve themselves of the liability which they have assumed by the contention that water is only necessary for irrigation during a limited period and in a quantity greatly less than that which the company has contracted to deliver. Whatever might be the rights of the company and the purchasers, or of the purchasers themselves under the prorating system which is suggested in the contract, may be left wholly out of consideration. This case does not involve the rights of consumers as between themselves, nor the rights of the company as a consumer of water under the same ditch and from the same supply. The naked question in this case is whether the grantees are entitled to be treated as the owners of the property, and have a right to insist on the formation of a new company according to the scheme outlined in their deed and to the delivery of stock according to the terms of their contract. We conclude this time has arrived, and that according to the present record the grantees of the company are entitled to compel the organization of the new corporation contemplated by their contract and to the issue of capital stock to them in such proportion as their interest warrants.

The decree was not aptly drawn for the enforcement of these rights.   It provided that the plaintiff and the other holders of deeds might organize this corporation.   Such was not the provision of the contract, nor was the plaintiff on the proof which he offered entitled to that relief.   He had the right to insist that the board of directors of the La Junta Company should designate five persons who were the holders of water rights to organize a new company and distribute the stock in accordance with the scheme provided.   Beyond that the court could not go.   Of course it would be true if the board of directors of the La Junta Company should refuse to execute the mandate of the court, a way could be found by which action could be compelled, or in case of failure the rights of the plaintiffs and his co-grantees could be conserved and protected.   The parties are entitled to have the new company organized and to receive their stock.

For the error which the court committed in entering the decree in the form which it did, the case must be reversed and sent back for further proceedings in conformity with this opinion.

*Reversed.*